Opinion delivered June 2, 1886.

---

[No. 5010.]

## George Dickey *v*. The State.

RAPE—FACT CASE.—See the statement of the case for evidence *held* insufficient to support a conviction for rape.

APPEAL from the District Court of Dallas. Tried below before the Hon. G. N. Aldredge.

The conviction in this case was for the rape of Mattie Reid, in Dallas county, Texas, on the nineteenth day of March, 1886. A term of five years in the penitentiary was the penalty assessed against the appellant.

Miss Mattie Reid was the first witness for the State. She testified that she was seventeen years of age, and that she had known the defendant about two years. A marriage engagement, to be consummated in June, 1886, had existed between the witness and the defendant for about a year. Witness met the defendant at Blankenship & Blake's establishment, in Dallas, Texas, where she was employed, on February 19, 1886, and agreed to meet him that night at the house of Mrs. Applefelter,

whose daughter was also employed by Blankenship & Blake. Witness had once met the defendant at the house of Mrs. Mattox, who also had a daughter in the employ of Blankenship & Blake. Witness stayed all night at Mrs. Mattox's house on that night. Her custom was to spend the night at the house of Mrs. Mattox and Mrs. Applefelter when she went to meet the defendant. She met the defendent at the houses of her friends because her parents opposed her association with defendant, and always passed the night with those friends to avoid scoldings she would receive if she returned at night under the escort of the defendant.

Arrived at Mrs. Applefelter's on the night referred to, witness and defendant found the house full of company, and concluded to go to the house of another friend who worked with her for Messrs. Blankenship & Blake. They failed to find the house of that friend, and defendant proposed to take witness home. Witness replied that she was afraid to go home. Defendant then suggested that he would take the witness to a hotel and get her a room, and secure rooms for himself at another hotel. The defendant first took the witness to an hotel the name of which the witness did not remember. Defendant paid for the room, but finally cancelled the engagement because of the price charged. He then took the witness to the Crutchfield house, and secured her a room. On the way to the Crutchfield, defendant asked witness if he could go to the room and sit with her awhile, to which she agreed. They went to the room together, sat down together on the side of the bed, and talked for awhile. When, finally, the defendant got up to leave, he undertook to take the room key with him, leaving the witness locked in. Against this the witness protested, and declared that she would not occupy the room if locked in. She took the key from the defendant and placed it on the mantle, near the lamp. Defendant then said that if he could not lock the witness in, he would not leave her. The two then resumed their seats on the side of the bed, and the defendant made efforts to embrace and kiss the witness, finally proposing to witness: "Give me some."

Witness declined to minister to his passion. Defendant then asked the witness to let him sleep with her. Witness refused, and defendant said: "Why, you sleep with somebody every night." Witness denied that she did, and defendant said: "Yes you do; you sleep with your sister." Defendant then threw the witness on the bed, and made an attempt to rape her. A strug-

gle of ten minutes ensued. Witness did not scream while on the bed, but struggled out of bed, to the floor on the rear or wall side of the bed. Defendant pulled the bed away, and threw the witness to the floor. Witness screamed once while on the floor, and struggled and resisted as long as she could, but to no purpose. Defendant actually accomplished the object of his assault. He introduced his male member into her private organ and had carnal knowledge of her, without her consent, and against her will. Witness was sore for several days afterwards from the effects of the defendant's treatment. Fever and sickness ensued, and Doctor Gibbs was called in and examined her.

Cross-examined, the witness admitted her signature to her written statement, made before justice of the peace Kendall, on the defendant's examining trial. She admitted that she stated on that trial that the defendant did not penetrate her person. That statement was untrue, and witness now declares, most positively, that the defendant did penetrate her sexual organ. He accomplished her rape by physical force, and used no threats. Witness denied that she told the crowd which invaded her room after the rape, that she was the wife of the defendant, and first, that they were married in Dallas and then that they were married in Fort Worth. Witness told the crowd her name was Mattie Johnson, and that she lived on Main street, near the stock yards, which statements were untrue. The crowd, rushing into the room, frightened the witness. Witness lived above the Union depot, a very considerable distance from the stock yards.

M. M. Hines testified, for the State, that, on the night of February 19, 1886, he and his child occupied the room in the Crutchfield house, immediately underneath that in which the rape is said to have been committed. Witness retired on that night before nine o'clock. He was soon awakened by a scuffling noise in the room overhead. Thinking that the noise was made by a couple of drunken men, he at first paid little or no attention to it, but when he presently recognized a woman's voice, he went to the hotel office and asked the clerk who was occupying the room just above his. The clerk replied that that room was occupied by a man and his wife. The witness, satisfied, returned to bed, but, the scuffling continuing, he got up again, waked up Captain Williamson, and with him and other parties, including some ladies and an officer, went to the room. Constable Miller opened the door, which was not locked. Miss Reid was lying on the floor, resting her head on her hands. The defendant was on

his knees in front of her, in the act of getting up. Miss Reid's hair was disheveled, and she and defendant appeared to be very much worried. Miller asked what was to be inferred from the extraordinary position in which the parties were found. Defendant replied that the lady was his wife, but offered no further explanation. He then turned to Miss Reid, and asked her if she was not his wife. She replied: "Yes, we were married here in Dallas." Witness remarked: "That can be readily ascertained from the records." Miss Reid then said that she and defendant were married at Fort Worth. Afterwards she said that she and defendant were not married; that her name was Johnson, and that she lived near the Stock Yard saloon; that she had known the defendant for three years, during the last of which she had been engaged to marry him. Witness was unable to say whether or not Miss Reid's clothes were up when the crowd entered the room. He heard no screaming. He heard no cries for help. He heard only scuffling and groaning. There were no tears on Miss Reid's face. The lamp was still burning in the room when the crowd entered.

Constable George H. Miller testified, for the State, that, on the night of February 19, 1886, the clerk of the Crutchfield house told him that trouble was in progress between a man and a woman in one of the rooms of the house. Witness went to the room with Hines and several other parties, including some ladies. He found the door unlocked, and a lamp burning. Miss Reid was lying on her back on the floor, her head towards the foot of the bed. Defendant was on his knees, between her legs. Miss Reid got up without assistance, but at first seemed very much exhausted. Witness arrested both the defendant and Miss Reid, and took them to jail, and, on the next morning, made complaint against the defendant.

County physician Gibbs testified, for the State, that, at the instance of the county attorney, he visited Miss Reid, some fifteen or twenty days after the alleged rape, and found her suffering with fever. He made a digital examination of her private organ. He discovered that the hymen had been ruptured, and that the parts were very much ulcerated. The introduction of the male organ, or any other blunt instrument, into the sexual organ of a female, would rupture the hymen. Disease frequently destroys the hymen of a woman. The rape of a young woman, or girl, would be attended with pain and severe laceration of the parts, and pain. Witness could not say what, in this case, caused the

rupture of the hymen, nor what caused the fever. The ulceration of the parts may have resulted from uncleanliness or disease. If raped, Miss Reid's private parts must have been very much lacerated in order to produce the degree of ulceration from which she was suffering when witness examined her. The State closed.

M. Rosenthal testified, for the defense, that he was the proprietor of the Pacific hotel, on Pacific avenue, in Dallas, Texas. On the night of February 19, 1886, the defendant and a woman, whom witness believes he recognizes in Miss Reid, came to the hotel and asked for a room for himself and wife. A room was assigned him, and payment in advance demanded. Defendant handed the clerk a five dollar bill. The clerk passed it to witness for change, who returned silver. The clerk then handed four dollars to the defendant. Defendant asked if witness was going to charge him a dollar for a bed. Witness referred him to the clerk, who replied that a dollar was always charged a man and wife for a nice room and bed. Defendant replied with an oath that he had often rented beds for twenty-five cents, and was unwilling to pay more. He declined to accept the bed at seventy-five cents, his money was refunded, and he and Miss Reid left. Miss Reid stood near the defendant throughout this conversation, and could have heard it all.

The defense introduced in evidence the written statement of Miss Mattie Reid, as made upon the examining trial. Her narrative, to the time she recovered the room key from the defendant, were substantially the same as her statement upon this trial. Thenceforward, the written statement reads as follows: "After I refused to let him have the key back, he threw me over on the bed, and tried to rape me. I resisted him. He then seized my person, and continued trying to rape me. I at first struggled with him, until I found that he was about to overpower me, when I cried out. I struggled out of bed to my feet, and got away from him behind the bed. He then got up, rolled the bed away from the wall, seized hold of me and threw me on the floor behind the bed. He pulled my clothes up, and I then cried out. I did not cry out until I was thrown on the floor. He held my hands so I could not get up or resist him. He then commenced to rape me again. I continued to scream out, which attracted the attention of the people, who came up to the room. Mr. George Miller arrived amongst them, and arrested the defendant. He was on top of me when the people first came in to

the room, and was still trying to accomplish his purpose. He had been trying to rape me for about a half hour, as I believe. He got on top of me, and was struggling with me from the time he threw me on the bed, until the people got to the door. He could not hold me still enough to accomplish his purpose. He did not enter my person. I was so very sore on the next day that I could scarcely walk. I mean my arms and limbs. During the struggle he said I was the hardest case he had ever had any thing to do with. He said he was going to have it, or die right there. He made no threats, and said nothing else.

\* \* \* \* "I did not tell defendant not to register my name (at the hotel). He wanted to register as man and wife, but I would not permit it. He did not tell me I had better go alone up to the room. I gave my name to the officers that night as Mattie Johnson. I know constable George Miller. He came into the room. I did not tell him after he came into the room that the defendant was my husband. I did not, in answer to questions asked by defendant, in the presence of officers, say that I was his wife. I was engaged to the defendant, and was to have married him in June next. When I said that he did not enter my person, I meant that he did not accomplish his purpose, but he did enter the lips of my private parts, and I only prevented his going further by moving my body. I have told every thing in my statement like it occurred. I meant that he did not accomplish any thing, when I said he did not enter my person. He remained in this condition about five minutes. My person was not protected by my underclothing. I was not lacerated by the attempt."

The motion for new trial raised the questions discussed in the opinion.

*Edwards & Miller,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. This is an appeal from a conviction for rape, the punishment assessed by the judgment of the lower court being five years in the penitentiary.

We are not satisfied with the sufficiency of the evidence, as developed in the record, and do not believe that a conviction based upon such testimony should be permitted to stand as a precedent in such cases. (The Reporters will state the facts in full.)

Because, in our opinion, the evidence is insufficient to support the verdict and judgment, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*